No. 123,504

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.H.,
A Minor Child.

SYLLABUS BY THE COURT

Incarceration is not an automatic basis for a finding of parental unfitness. The facts of each case dictate how the court should view the incarceration of a parent.

Appeal from Smith District Court; JESSIE A. THOMPSON, magistrate judge. Opinion filed August 20, 2021. Reversed.

*Katie J. Schroeder*, of Schroeder Law Office, LLC, of Beloit, for appellant natural father.

*Tabitha D.R. Owen*, county attorney, for appellee.

Before ARNOLD-BURGER, C.J., BUSER, J., and MCANANY, S.J.

ARNOLD-BURGER, C.J.:  This is a case about a father who had custody of his son with the blessing and encouragement of the State, whose son was thriving in his care, and who arranged for his son to be cared for by someone with whom they both have a close familial relationship while father went to prison. We further have a father who has provided for his son financially while he is in prison and has a home and job waiting for him when he gets out of prison. We have a father who has maintained contact with his son on a regular basis while he is in prison. But instead of letting this father exercise his rights as a parent under difficult circumstances, the State swooped in and transferred custody of his son when he went to prison—not one minute before—and placed the child with the child's maternal grandparents. Even so, this father continued to provide for the child, and the State continued to assure the father that it would agree to a permanent

1

custodianship of his son with the close family friend rather than seek to terminate his parental rights. And then, seemingly out of nowhere, the State moved to terminate this father's parental rights for no other reason than his incarceration. Because we find that the district court's finding of this father's unfitness was not supported by clear and convincing evidence, and its decision that it was in the child's best interests to have father's parental rights terminated was unreasonable, we reverse.

FACTUAL AND PROCEDURAL HISTORY

The facts are not in dispute.

T.H., born in 2015, is the only child of Father and Mother, although Mother has four other children. Mother has relinquished all rights to her children, and this appeal involves only Father's parental rights to T.H. T.H. was five years old and in preschool at the time of the termination hearing in this case.

Mother and Father were in a relationship when T.H. was born, but the relationship ended about six months after his birth. They never had a formal custody arrangement, but shared custody of T.H. with T.H. spending a week or two at a time with each parent. Father worked on oil rigs and was out of town for extended periods, but he would visit T.H. at Mother's on his day off. Father has always provided financial support for T.H.

When Father needed help T.H. would also stay with a woman Father described as his "sister," Stephanie. T.H. called Stephanie his "aunt." But she was a long-term friend of Father, not a blood relative. Father considered Stephanie a member of the family and she attended family functions, including those involving T.H.'s siblings. She was present the day T.H. was born.

2

When T.H. was 14 months old, he suffered a concussion under Mother's care. Father took custody of T.H. and filed for a protection from abuse order against Mother. Father was granted temporary custody of T.H. while T.H. was recovering. After he recovered, Mother and Father continued their shared parenting agreement. At roughly the same time, Father pleaded guilty to possession of methamphetamine with intent to distribute. The district court sentenced him to probation for 18 months, with an underlying 18-month prison sentence.

In 2018, Father visited T.H. and discovered that T.H.'s half-sister had put liquid nail adhesive on his back. When Mother removed the adhesive, it blistered and pulled his skin. Mother did not tell Father about this, and she did not take T.H. to the doctor. Father immediately removed T.H. from Mother's care and sought another protection order against Mother. Father returned T.H. to Mother's care in the summer of 2019 after six to eight months in his custody. During that time, Father allowed Mother and siblings to visit T.H. at his home but they only visited twice. T.H. revealed that he missed Mother and his siblings, so Father allowed him to return. By this time, Father was working at Bonnie Plants in Plainville and would not get home until 10 or 11 in the evening, and T.H. was about to start preschool. Father advised Mother that he would try letting her have primary custody of T.H. again "but if anything happened, this would be it."

In January 2019, the State charged Father with distribution of methamphetamine, and the court released him pending trial on pretrial supervision. Father admits that in the past he sometimes used methamphetamine, although he contends that it was never when T.H. was with him. He claims that he was not a regular user, and no one at the hearing disputed that claim. He contends he started dealing drugs to provide for his family while between jobs.

On September 20, 2019, T.H. arrived at preschool and had burns on his feet, which the school reported to the Department for Children and Families (DCF). An

3

investigation by Child Protective Services (CPS) revealed that Mother had started a fire to burn trash, and T.H. stepped on burning plastic with his bare feet. Mother did not take T.H. to the hospital after he burned his feet but ran water over his feet and put medicine on the burns.

Father first learned of T.H.'s injuries on September 25, when he went to T.H.'s preschool with his parents for Grandparents Day. Father told CPS this was the third incident where Mother had hurt T.H. while in Mother's care. Father told CPS there was no custody order in place. He advised CPS, Mother, and maternal grandparents that he planned to take T.H. to live with him in Plainville. No one objected. Father retained physical custody of T.H. until he went to prison in March 2020.

Although we do not lay out the facts here of other incidents related to Mother's other children when T.H. was with Father, suffice it to say that she had a significant drug problem that led to her inability to parent any of her children. This ultimately led to her voluntary relinquishment of her parental rights to all her children. The maternal grandparents have always helped raise the children, financially provided for the children and Mother, and they currently have physical custody of the children. All children are doing well under their care.

On October 4, 2019, following another incident at Mother's home involving her other children—T.H. was at Father's house when this incident occurred—the State filed a child in need of care (CINC) petition over all the children, including T.H. The petition did not list any concerns about Father, only that because of inadequate supervision Mother had allowed T.H. to burn his feet and she failed to seek treatment for him. A couple of days later, Smith County Sheriff's Deputy Kenneth Jones filed a protective custody application for Mother's other four children (*not including T.H.*) based on concerns about Mother's home and care of the children, which was granted the next day.

4

Four days later, the district court held a temporary custody hearing regarding all the children. The district court ultimately placed the children in DCF custody. The court allowed T.H. to remain with Father, and the court ordered family preservation services in his home. The court placed Mother's other children with maternal grandparents. The court and DCF were aware of Father's pending criminal charges. Father allowed T.H. to have contact with his siblings and maternal grandparents and DCF encouraged the same. Family preservation services randomly visited Father's home, and Father submitted to frequent and random UAs. During this case, he has never tested positive. Between DCF, Community Corrections, and the court, he estimates he submitted to 77 UAs, all clean.

While with Father, T.H. received a physical examination and treatment for his burns. Father also had T.H. screened at school for an individualized education program (I.E.P.). Father was truthful with DCF about his pending criminal case and likelihood of a prison sentence. Father discussed the possibility of the court placing T.H. in Stephanie's custody while he served out his prison sentence. In her adjudication hearing report to the court dated November 12, 2019—just over 30 days after DCF took legal custody of T.H.—St. Francis Community Services (SFCS) Case Manager Kayelee Fokken, with the approval of her supervisor, recommended T.H. be *released from DCF custody* and placed with Father:

> "[Father] appears to be following [SFCS] recommendations and followed the orders of his PO. [Father] has been very focused on carrying [*sic*] for [T.H.] and displays that he wants what is best for [T.H.]. [Father] has inquired what may happen to [T.H.] should he be sentenced to prison. Staff has discussed with DCF that [T.H.] may be able to go to [Father's] sister [Stephanie].
> ". . . .
> "Therefore, Saint Francis respectfully requests the following at this time:
> "[T.H.] be released from DCF custody and placed with this father."

Just two weeks later, the same case manager noted that Father had lost his job because of his impending incarceration. Although SFCS knew imprisonment was approaching since Father's first contact with DCF, the case manager changed her recommendation from releasing T.H. from DCF custody, to keeping T.H. in DCF custody and releasing him to his maternal grandparents when Father went to prison. At that time, DCF believed, based on Father's report, that Father could go to prison for 10 years.

The next month, the district court held an adjudication hearing concerning the children. As for T.H., the district court adjudicated him as a CINC and ordered all previous orders to remain in effect. T.H. remained in DCF custody and his placement with Father continued. At the disposition hearing in January 2020, the district court made similar orders. DCF had no concerns with T.H. residing with Father, and Father could meet all T.H.'s needs. DCF conducted regular home visits.

In March 2020, Father pleaded guilty, and the district court sentenced him to separate 68-month sentences for two counts of distribution of methamphetamine. The sentences ran concurrently, which made May 2024 Father's earliest possible release date. DCF moved T.H. to an out-of-home placement with T.H.'s maternal grandparents, with his siblings. At this point, T.H. had been residing exclusively with Father for six months with no issues.

In April 2020, DCF filed a permanency plan with the court for T.H. It continued to recommend reintegration with Father. It noted that T.H. was developmentally on track, was adjusting well to his placement with maternal grandparents, and would continue to have contact with "paternal family members." Father was to attend and complete parenting classes, remain drug free, avoid negative law enforcement contact, and have no disciplinary action in prison. Finally, DCF noted that "[s]hould case plan tasks not be followed, reintegration may not be a viable goal."

6

Father has resided in a minimum-security prison since March 2020. Since he has been in custody, Father has participated in the DCF reintegration plan. He has completed all plan tasks that he is able to complete in prison including completion of a parenting class, remaining drug free, communicating openly with SFCS, signing an Indian Child Welfare Act (ICWA) affidavit, and having no disciplinary action in prison or negative law enforcement contact. He has earned 64 days of good-time credit. Upon the lifting of COVID-19 restrictions, Father is eligible to get a job in private industry outside the prison. In the meantime, he works in the kitchen at the prison. Except for some periodic delays because of various COVID-19 related issues—including Father's own contraction of COVID-19 in prison—Father has maintained contact with T.H. almost every weekend. When the prison lifts its COVID-19 restrictions, Father will be able to visit with T.H. in person and plans to do so. He also hoped that they could have video calls, but there was a problem with maternal grandparents setting them up.

Father was employed before his incarceration and has the same well-paying job available to him—$1,200 every two weeks—upon his release. His boss testified on his behalf at sentencing. While he was working, he saved his money and a $12,000 bonus he received. He bought a newer car that had air bags and put the rest in an account for T.H. Upon his incarceration he signed a durable unlimited power of attorney over to Stephanie who maintains everything, including his car, for T.H. Father also has his own house to live in upon his release.

On July 21, 2020, SFCS filed an update with the court. The report noted that Father was complying with all the reintegration tasks he could while in prison. Father again expressed his desire that DCF place T.H. with Stephanie while he was in prison. He wanted her to be named permanent custodian. SFCS noted this request and Stephanie's ability to care for T.H. Stephanie had a job and could provide T.H. with insurance, schooling, and daycare. She would also maintain his relationship with Father, maternal grandparents, and T.H.'s siblings. The report confirmed that a meeting would be set up

7

with maternal grandparents to discuss a possible change of placement to Stephanie before the July 30 court date. That said, at the end of the same report, a different employee, SFCS Permanency Specialist Meagan Eiland, concluded that "[d]ue to the case going on for 9 months, the parents' ability to comply with the case plan tasks, and maintain the children's safety, [SFCS] believes reintegration should no longer be viable." The permanency goal for all Mother's children, including T.H., was changed to adoption.

The court held a permanency hearing on July 30, 2020. The court changed the goal from reintegration to "either adoption or permanent custodianship." The court ordered St. Francis to "do a home visit on [Stephanie] to consider potential non-kinship placement for [T.H.]." See K.S.A. 2020 Supp. 38-2202(q) ("'Kinship care placement' means the placement of a child in the home of an adult with whom the child or the child's parent already has close emotional ties.").

DCF continued to examine Stephanie as a permanent custodian for T.H. It advised Father's attorney that it would agree to placement of T.H. with Stephanie.

On August 28, 2020, the State filed a motion for termination of Father's parental rights. Only one paragraph of a multi-page motion is devoted to Father:

"On 3/3/2020, [Father] was sentenced to approximately 5 years in prison with two counts of distribution of methamphetamine. [T.H.] was placed with his maternal grandparents on 3/6/2020. [T.H.] and [Father] have had little contact since then as he is in prison. Most of the communication is through the maternal grandparents. [Father] sends pictures and letters to [T.H.] and is working on getting video calls arranged for [T.H.]. [Father] is unable to meet [T.H.'s] needs at this time due to a failure to comply with the case plan tasks given to him by Saint Francis including but not limited to: incarceration, inability to communicate with [T.H.] or set up in person visitations, inability to complete parenting classes or any programs assigned to him by St. Francis, and overall inability to care for [T.H.] due to incarceration."

When the document discussed statutory factors supporting termination, it listed Father's conviction and incarceration. It was clear that the document mainly dealt with Mother and the other children's fathers. In every paragraph that discussed statutory factors, Father's incarceration was *the only* factor discussed.

In October 2020, an updated permanency plan was filed with the court. The plan noted Father had completed his tasks. There was no longer any discussion of Stephanie as a placement option. Instead, the plan noted that "[SFCS] will continue to assess any kinship options that come forward." The plan did not reveal why Stephanie was no longer being considered for placement as a permanent custodian, or why she was not being seen as a foster placement option, or the result of the ordered walk-through of her residence. Stephanie testified at the termination hearing that if she needed to become a licensed foster care provider for the court to appoint her custodian of T.H., she would. The magistrate judge never mentioned it in her final orders from the bench and referred the case for adoption.

The court held the termination hearing on November 20, 2020. Testimony was provided by Eiland for SFCS, maternal grandfather (Grandfather), Stephanie, and Father.

During her testimony, Eiland noted for the first time, contrary to her prior discussions with Father's attorney, that obtaining permanency through a permanent custodianship with Stephanie was not ideal because it would separate T.H. from his siblings. But during cross-examination she admitted that DCF had approved of T.H. living apart from his siblings when they allowed him to remain with Father. Eiland also pointed to the fact that it was traumatic for T.H.'s sisters not to be with him, although she admitted that has no bearing on the best interests of T.H. She stated that they "like to have children back into their parents' home within a year of being removed." She testified that it was in the best interests of T.H. that Father's rights be terminated, and the permanency goal be adoption. Yet she admitted that Father completed parenting classes;

9

he has remained drug free; he has maintained regular contact with SFCS; he has completed the paperwork he was ordered to complete; he has had no negative contact with law enforcement, nor has he had any disciplinary reports; and he is maintaining regular contact with T.H. She also acknowledges that there was a close bond between Father and T.H. and she has encouraged continued contact between the two. She also noted that maternal grandparents allow T.H. to frequently stay with Stephanie, sometimes as often as consecutive weekends.

Eiland also stated her overarching belief that children should have permanency within one year, or adoption within two. She also stated her belief that the length of Father's incarceration alone was sufficient justification for termination of his parental rights.

Grandfather had no concerns about Stephanie and confirmed that Stephanie and T.H. have a healthy relationship. He believed Stephanie should continue her relationship with T.H. Grandfather confirmed that Father has been providing financial support for T.H. while he is in prison through Stephanie.

Stephanie agreed that her relationship with maternal grandparents was a good one. She also provides financially for T.H. by buying him gifts, paying for groceries and snacks when he is with her, and entertainment, like trips to the zoo. Father can and does talk to T.H. whenever T.H. is with Stephanie. There is no indication in the record on appeal that there is anything but a supportive relationship between Father, Stephanie, and maternal grandparents. Father testified that he and maternal grandparents have discussed and expected that T.H. will return to Father's custody upon Father's release from custody.

Father testified that he did not believe that terminating his parental rights was in T.H.'s best interests. He wanted to continue to care for T.H. once he is released from prison. Father knew T.H. would be unable to return to his home immediately after he was

released, but he expressed his willingness to complete whatever tasks the court or DCF assigned to him upon release. Whatever happened at the hearing, Father said he would continue to support T.H. financially and emotionally in every way he could.

Except for Grandfather, who the parties did not ask, all persons who testified agreed that Father has a very close father-son relationship with T.H. and has since T.H.'s birth. All agree, contrary to the allegation in the State's petition to terminate his parental rights, that Father has maintained contact with T.H. while he is in prison. In fact, DCF has encouraged that contact. All agree that Father has been providing for T.H.'s financial needs while Father is in prison, including food, school supplies, clothing, birthday gifts, and Christmas gifts. Before his incarceration, Father had never been away from T.H. for longer than two weeks. T.H. will be 8 years old when Father is released.

At the close of the evidentiary hearing on termination of Father's parental rights, the State asked the district court to terminate Father's parental rights. The State argued that distributing drugs was no better than using them, and Father's felony convictions *alone* were reason enough to terminate his rights. The State also argued T.H. had a right to permanency within a reasonable timeframe, and time is different from a child's perspective than from an adult's perspective. The State believed the district court should also account for Father's past actions as an indicator of future behavior. The State acknowledged the difficulty of these types of cases but maintained its belief that T.H.'s best interests would be served by terminating Father's parental rights.

Father argued that he cared for T.H. since he was born, and he often ensured T.H.'s safety after Mother demonstrated her inability to do so. DCF, SFCS, and the district court also knew about Father's pending criminal case when DCF made the decision to place T.H. in his home. Once reintegration and parental services began, no evidence suggested that Father disregarded the requirements placed upon him. In fact, he completed many of the assigned case plan tasks. Father had also refrained from drug use since DCF placed

11

T.H. in his home, as evidenced by his negative urinalysis tests. Since being imprisoned, Father did not have any disciplinary complaints, maintained contact with T.H., and supported him financially. Once he is released, Father can return to his prior employer where he will work full-time.

Father also argued that Stephanie had the ability to care for T.H. until he is released from prison because she could provide for all T.H.'s needs. If he stayed with Stephanie, T.H. could also further his relationships with his grandparents, Father, and Stephanie. Father believed the evidence only supported one statutory factor for termination, which was his felony convictions and imprisonment. He argued, however, that, standing alone, his felony convictions should not be enough for the district court to terminate his parental rights. He pointed to the close bond he and T.H. had and claimed that it was not in T.H.'s best interests to terminate his parental rights.

The district court then discussed the case. The overriding concern, for the district court and the agencies involved, was permanency for T.H. The district court noted that Father's release from prison could not occur until May 2024. When viewed from child time, the district court did not believe that permanency could be achieved in a reasonable amount of time. Ultimately, the district court found that Father was unfit and that his condition was unlikely to change in the foreseeable future. It then cited K.S.A. 2020 Supp. 38-2269(b)(5) and (b)(7) and concluded that termination was in T.H.'s best interests.

Father timely appeals.

12

ANALYSIS

On appeal, Father argues the district court erred when it terminated his parental rights. Father contends there was insufficient evidence to support the district court's decision.

"[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Recently, the Kansas Supreme Court reinforced this point by holding that a parent's fundamental liberty interest in the right to make decisions regarding the care, custody, and control of their children is a principle "without dispute." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019). But like all constitutional rights, even fundamental ones, this right is not without limits. Because child welfare is a matter of state concern, the interests of the State of Kansas "may be asserted through state processes designed to protect children in need of care." 310 Kan. at 146.

The interplay between the child's best interests and parental rights is the difficult balancing task the court must perform when deciding whether to terminate parental rights. *In re M.M.*, 19 Kan. App. 2d 600, Syl. ¶ 4, 873 P.2d 1371 (1994). The district court must make three findings before terminating parental rights. The court must find by clear and convincing evidence that the parent is unfit, the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and by a preponderance of evidence that termination of parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

Here, the district court found that the evidence supported termination of Father's parental rights under K.S.A. 2020 Supp. 38-2269(b)(5) (conviction of a felony and

13

imprisonment) and K.S.A. 2020 Supp. 38-2269(b)(7) (failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family).

*We examine evidence presented to the court of Father's unfitness under K.S.A. 2020 Supp. 38-2269(b)(5) (conviction of a felony and imprisonment) and K.S.A. 2020 Supp. 38-2269(b)(7) (failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family).*

Before terminating a parent's right to their child, the court must find that the parent is unfit. The Supreme Court has defined "'unfit'" as meaning, in general, "'unsuitable, incompetent or not adapted for a particular use of service.'" *In re Armentrout*, 207 Kan. 366, 371-72, 485 P.2d 183 (1971). A parent who neglects or refuses, when able to do so, to provide proper or necessary support or other care necessary for the child's well-being is unfit. Treating a child with cruelty or inhumanity, failing to provide necessary support and education when able to do so, and abandoning or neglecting a child is also considered evidence of parental unfitness. *In re Vallimont*, 182 Kan. 334, 340, 321 P.2d 190 (1958). In 1982, the Kansas Legislature adopted the Kansas Code for Care of Children, K.S.A. 38-1501 et seq.—now known as the revised Kansas Code for Care of Children, K.S.A. 2020 Supp. 38-2201 et seq.—and statutorily outlined a nonexclusive list of factors to consider in determining fitness to parent. See K.S.A. 2020 Supp. 38-2269.

When we review a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-finder could have found the ultimate determination to be highly probable, i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705. Clear and convincing evidence of a single statutory factor under K.S.A. 2020 Supp. 38-

2269(b) can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 2020 Supp. 38-2269(f).

Kansas statutes provide that a district court may make a finding of unfitness if there is clear and convincing evidence that the parent has been convicted of a felony and imprisoned for that conviction. K.S.A. 2020 Supp. 38-2269(b)(5). But incarceration does not necessarily result in an automatic and exclusive basis for an unfitness finding. Incarceration can be a mitigating or a negative factor in the parent's continued ability to parent their child. See *In re M.D.S.*, 16 Kan. App. 2d 505, 510, 825 P.2d 1155 (1992). The facts of each case dictate how the court should view the incarceration of a parent. See *In re M.H.*, 50 Kan. App. 2d 1162, 1172, 337 P.3d 711 (2014).

"When a nonconsenting parent is incarcerated and unable to fulfill the customary parental duties required of an unrestrained parent, the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability. It is obvious that a parent imprisoned for a long term cannot provide the customary parental care and guidance ordinarily required. If an imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship with his or her children, it is for the trial court to determine the sufficiency of such efforts." *In re F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

Here, the district court noted that Father's most recent conviction was his third felony conviction for distribution of methamphetamine, all of which had occurred during T.H.'s life. As a result of Father's convictions, T.H. could not reintegrate into his home for multiple years. As a result, the district court determined Father's incarceration was a negative factor because it did not allow permanency to be established for T.H.

Father does not dispute the fact that he is incarcerated for a felony and will be until 2024. And we concede—although not mentioned or relied upon by the magistrate judge—that Father has other remote misdemeanor convictions and a juvenile adjudication

15

dating back to 1992 in his criminal history, but there is no indication he ever served any time in jail for them. Instead, Father distinguishes this case from other CINC cases involving incarcerated parents. We agree with Father that the distinctions present here are significant from other Kansas cases involving unfitness based on incarceration.

In all the cases we have examined in which incarceration was a driving factor in termination of parental rights, other significant factual differences played a part in that decision. See *In re M.H*, 50 Kan. App. 2d at 1172, 1174 (father incarcerated for majority of child's life, evidence of significant impact on relationship with child, neglected to attend case-plan meetings by phone, had many disciplinary violations in prison further delaying his release, had spent as little as one day with child before child put in State custody); *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002) (father had "dramatically infrequent and superficial [contact with D.T.], even when the time and tandem incapacity of his incarceration is eliminated from the calculus. He also admitted that he had not contacted or supported D.T., although, in our view, these activities would not necessarily have been prohibited by his prison time."); *In re C.C.*, 29 Kan. App. 2d 950, 953-54, 34 P.3d 462 (2001) (parents both incarcerated and meth lab in home while children were there which led to a conviction for child endangerment); *In re B.A.D.*, No. 119,088, 2018 WL 4840446, at *6 (Kan. App. 2018) (unpublished opinion) (incarcerated five of seven years of child's life and child probably did not even know who he was); *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *4 (Kan. App. 2017) (unpublished opinion) (father never parented or had close familial relationship with his child because he had been imprisoned for the child's entire life); *In re K.O.*, No. 116,704, 2017 WL 2403304, at *5 (Kan. App. 2017) (unpublished opinion) (father sent his child a single letter between child's birth and the termination hearing, father had no familial relationship with child); *In re S.C.*, No. 116,083, 2017 WL 463747, at *3 (Kan. App. 2017) (unpublished opinion) (lack of contact with S.C. for five years before CINC proceeding initiated); *In re A.R.*, No. 106,457, 2012 WL 1352876, at *3 (Kan. App. 2012) (unpublished opinion) (father has had almost no contact with A.R. and knows very little

about her); *In re L.M.P.*, No. 105,741, 2011 WL 4721374, at *2 (Kan. App. 2011) (unpublished opinion) (L.M.P. was afraid of father and how abusive he could be, although he wrote to children from prison his correspondence was aggressive and manipulative, and father provided no monetary support since incarceration). The facts here are decidedly different.

The dissent focuses on Father's criminal history. But it fails to note that there is no evidence Father is addicted to drugs or participated in any dangerous drug related activity in T.H.'s presence. Although dealing in drugs is certainly not legal or appropriate behavior for a parent, the dissent ignores that fact that since he was charged in January 2019, Father has completed over 77 clean drug tests with no positive tests. He has complied with every request made of him by the State in both his CINC case and his criminal case. He has adjusted his circumstances and conduct. The dissent is unable to cite any Kansas case similar to this one—where the *only* reason for termination stated by the magistrate judge and argued by the caseworkers in their reports and testimony was incarceration.

The three cases the dissent cites in support of its position simply do not support such a conclusion. Slip op. at 41-43; see *In re C.C.*, 29 Kan. App. 2d at 953-54 (Police arrive at home when serving a search warrant and encounter overpowering smell of chemicals to the point they could not breath and discover parents are manufacturing methamphetamine in the home with children present—and both parents were jailed for charges that included child endangerment.); *In re A.D.C.*, No. 98,206, 2008 WL 360717, at *1 (Kan. App. 2008) (unpublished opinion) (mother killed, father incarcerated from moment State removed child from home; cocaine, cash, weapons, and drugs found in home within reach of child; by time of the termination hearing father had not seen child since child was one year old; father continued to test positive for drugs and failed to complete any reintegration tasks; father failed to provide any financial support); *In re Y.D.W.*, No. 95,137, 2006 WL 1170263 (Kan. App. 2006) (unpublished opinion) (this is a

17

case affirmed under Supreme Court Rule 7.042(c) and (e) (2005 Kan. Ct. R. Annot. 53), with absolutely no facts in the opinion to discern what other factors were present, but a review of the brief of the guardian ad litem in the case reveals that the State alleged five different grounds of unfitness).

We also find guidance in a stepparent adoption case. Our Supreme Court has held that in the case of a stepparent adoption, when a district court relies only on the parent's felony conviction and imprisonment, the court must find that the parent has not pursued the opportunities and options available to carry out such duties to the best of his or her ability. *In re F.A.R.*, 242 Kan. at 236. The termination of all of a parent's rights to custody and control of their child by a finding of unfitness should be no different. Although the dissent criticizes this conclusion, it ignores the fact that adoption is the next step in this case—court-sanctioned nonconsensual adoption. There can be no doubt that had this case been a stepparent adoption, under the same analysis used by the district court and affirmed by our Supreme Court in *In re F.A.R.*, a nonconsensual stepparent adoption would not have been allowed. The record is devoid of any evidence that Father failed to pursue the opportunities and options available to him to the best of his ability. To ignore the import of *In re F.A.R.* in this case would mean that Father—who was significantly more attentive to his child than the father in *In re F.A.R.*—will lose T.H. to an adoption by either a family member or a stranger without Father's consent. But if the termination had not taken place, a stepparent would not have been allowed to adopt T.H. when faced with an objection from Father. Such a result is nonsensical.

Father's criminal charges did not prevent T.H. from living with Father successfully throughout his young life. There was no evidence to dispute the fact that Father was not a regular drug user and had never used or sold drugs around T.H. There was evidence that he remained drug free since his current charge in January 2019. The district court did not order drug treatment as part of his sentence, nor did SFCS require drug treatment as part of his case plan, both indications that such treatment was not deemed necessary. Father's

18

charges and convictions, up until the day he went to prison for five years, did not prevent reintegration into Father's home while the case was pending. And the State knew that incarceration was in Father's future but continued to pursue a permanency plan of reintegration. In fact, the permanency plan developed one month *after* Father's incarceration noted that "[s]hould case plan tasks not be followed, reintegration may not be a viable goal." There is no dispute that Father followed the case plan tasks.

Father was supporting T.H. financially both before and after his incarceration. Although the dissent challenges Father's testimony as "largely uncorroborated," no one who testified disputed Father's testimony. Slip op. at 50. The State, through DCF or SFCS, did not. No reports submitted to the court disputed Father's testimony about his work history, income, and support of T.H. before and after his incarceration. In fact, contrary to the dissent's unsupported assertion, Grandfather, Stephanie, and Eiland all testified verifying Father's financial support of T.H. Because the State took custody of T.H. after Father went to prison—contrary to the care arrangements Father had put in place to care for T.H. while he was incarcerated—the State is also paying maternal grandparents to care for T.H. And while Mother had custody, Father was paying child support even though it was not court ordered.

DCF placed T.H. with his maternal grandparents who *expected* Father to take custody of T.H. after his release from prison. The testimony was clear that Father, Stephanie, and maternal grandparents were working together to provide stability and permanency for T.H. while Father was incarcerated. T.H. was not suffering at school and was progressing appropriately. Father arranged for Stephanie to look after T.H. frequently. He even arranged for Stephanie to consent to the court appointing her as permanent custodian or a foster parent to T.H.

We pause here to note that the dissent makes much of the fact that Stephanie was not Father's sister as he had described her to the SFCS caseworker. It points to this as

19

evidence that *all* of Father's testimony should be viewed with skepticism. It assumes bad motives on the part of Father in describing a close family friend as a sister. Slip op at. 51-52. Without *any* evidence to support its claim the dissent creates out of whole cloth a reason for this alleged deceit, stating:

> "A reasonable inference from this testimony is that Father's lie was designed to deceive Eiland, DCF, SFCS, and the district court to have his friend, [Stephanie], pose as a biological relative. In this way, Father sought to enhance the likelihood of [Stephanie] acquiring custody of T.H. rather than the boy's maternal Grandfather and Grandmother." Slip op. at 51-52.

Contrary to this made-up scenario, the only reason cited by SFCS for its conclusion that T.H. should not be placed with Father's friend was that it would cause T.H. to be separated from his siblings. Kinship placement under K.S.A. 2020 Supp. 38-2202(q) "means the placement of a child in the home of an adult with whom the child or the child's parent already has close emotional ties." Once the court has decided to remove a child from the custody of the child's parent, it may award custody to: "A relative of the child or to a person with whom the child has close emotional ties who shall not be required to be licensed [as a childcare facility]; any other suitable person . . . ." K.S.A. 2020 Supp. 38-2255(d).

So Father gained no advantage by calling Stephanie his sister as the dissent speculates. And we would suggest that this is not an uncommon practice. Many families have close family friends that are called aunts, cousins, or siblings when they are not biologically related. The term is often used to describe the scope and depth of the relationship, not the biological connection. The Legislature clearly recognized this when it defined "'[k]inship'" to include a person that is not just biologically related, but one in which the parent has close emotional ties. K.S.A. 2020 Supp. 38-2202(q). If this is the foundation upon which the dissent rests its claim that Father cannot be believed, it provides no support.

20

Father and T.H. have a close relationship and have communicated as much as possible given the strictures of COVID-19 protocols in the prisons. And finally, the State presented no evidence that the relationship between T.H. and Father had deteriorated in any way since Father's incarceration. Even so, the district court determined that Father's incarceration was a negative factor—the only one cited—because it did not allow permanency to be established for T.H.

In short, even when we examine the *undisputed* evidence in the light most favorable to the State, the record simply does not support the district court's ultimate finding of parental unfitness by clear and convincing evidence.

A district court may also terminate a parent's rights to his or her child if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. K.S.A. 2020 Supp. 38-2269(b)(7). "The language in K.S.A. 2019 Supp. 38-2269(b)(7) imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating the child with his or her parents." *In re A.P.*, No. 121,913, 2020 WL 3022868, at *10 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 891 (2020). The requirement exists to provide a parent with an opportunity to succeed, but to do so requires the parent to exert some effort. *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019).

The parties agree that Father was compliant with the permanency plan; therefore, there was insufficient evidence to support a finding that the reasonable efforts of the enforcement agencies failed.

Here, the district court essentially concluded the reasonable efforts of the agencies failed because it would be impossible for the organizations to reintegrate T.H. into Father's home for the next few years because of his incarceration. But the district court did not discuss Father's compliance with case plan tasks when making its decision.

21

As stated, Father and SFCS made a case plan in March 2020, after Father was sentenced to prison. After the case plan was established, Father completed a parenting class and filed an ICWA affidavit. Father was also required to abstain from drug and alcohol use, and he did. Father testified that he submitted 77 negative urinalysis tests before incarceration.

Another task for Father was to participate in case management and family support services, but Eiland said the services SFCS could provide were limited while Father remained incarcerated. Similarly, the tasks related to background checks for those around T.H. and the person supervising T.H., and the requirement that Father refrain from drug and alcohol use did not necessarily apply because Father was incarcerated. The only other task discussed was that Father was not to have any negative law enforcement contact or corrective action in prison. As of the termination hearing, no negative contact or corrective action had been reported. Moreover, Eiland testified that while Father and T.H. received family preservation services from October 2019 until March 2020, Father met T.H.'s needs.

The State presented no evidence that Father failed to abide by any of the conditions of the family preservation services he received before going to prison. Thus, Father's pending criminal case was the reason the agencies' efforts to rehabilitate the family failed, not his inability to care for T.H. Even though the district court's conclusion that Father's incarceration makes it impossible for T.H. to be reintegrated into his home several years, there was no evidence presented that there was any deterioration in the relationship between Father and T.H.

When we review all the evidence, in the light most favorable to the State, we are unable to find that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that Father was unfit to parent T.H.

22

*The district court abused its discretion when it concluded that termination of Father's parental rights was in the best interests of T.H.*

Since unfitness is a necessary finding for termination of parental rights, we can end our analysis there. But even if we were to accept the district court's findings as to Father's unfitness, the court abused its discretion when it determined summarily that the termination was in the best interests of T.H. under K.S.A. 2020 Supp. 38-2269(g)(1). This omission alone is enough to reverse the judgment of termination. See *In re K.R.*, 43 Kan. App. 2d 891, 903, 233 P.3d 746 (2010).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making such a decision, the court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1). This decision is within the sound discretion of the district court, and the district court makes that decision based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116.

An appellate court reviews the district court's decision for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1115-16. A district court exceeds its broad latitude if its ruling stems from an error of law or fact or is "arbitrary, fanciful, or unreasonable." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Father argues that the district court's decision was unreasonable. Father advances two arguments to support his assertion. The first is that the district court failed to consider the bond between Father and T.H. And the second is that the district court failed to consider other permanency options. Because Father does not point to an error of law or

fact, the question becomes whether no reasonable person would come to the same conclusion. See *In re R.S.*, 50 Kan. App. 2d at 1116.

"The statutory requirement directs the court to give primary consideration to the physical, mental, and emotional health of the children. In so doing, the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d at 904.

Stated another way,

"To determine that the best interests of the child would be served by a termination of parental rights, the court must find that under no reasonable circumstances can the welfare of the child be served by continuation of the parent-child relationship." *In re Atwood*, 2 Kan. App. 2d 680, 681, 587 P.2d 1 (1978).

In *In re K.R.*, the court noted that many parents may be unable to carry through with obligations that are in the best interests of their children, like staying out prison so as to be able to provide a home for the child, but this does not mean that termination of their parental rights would be in the best interests of the child. See 43 Kan. App. 2d at 904. Even if Father were unfit, termination of parental rights is not mandatory. K.S.A. 2020 Supp. 38-2272(a)(2) allows for the appointment of a permanent custodian after a finding of unfitness, particularly a permanent custodian with whom the child has already bonded. See K.S.A. 2020 Supp. 38-2272(j).

There can be no dispute that Father's actions have caused him to be unable to parent T.H. in person. But this case is void of any other factors that would suggest that terminating Father's rights would be in T.H.'s best interests. See *In re K.R.*, 43 Kan. App.

24

2d at 904-05 ("We recognize that mother may not be the best model of motherhood, but this case is devoid of many factors present in other cases of this nature. There are no allegations of abuse, no allegations of addiction, no allegations of filthy living conditions, no allegations of a dangerous relationship with a boyfriend, and no allegations of lack of interest in the children.").

Father has gone to great lengths to make amends for his crime, remain drug free, and be free of disciplinary complaints in prison. He arranged for Stephanie to take a big role in T.H.'s care including providing money for her to meet T.H.'s needs. He has maintained a good relationship with the current custodians, T.H.'s maternal grandparents. Although T.H. will be 8 years old when Father is released, he will still have 10 years until adulthood. In the meantime, no evidence was presented that Father's incarceration damaged T.H.'s mental or emotional health, and there was no evidence in the record that T.H. struggles because of Father's incarceration. Father is keeping in regular contact with T.H. to the extent possible based on COVID-19 protocols established by the Department of Corrections and the inability of maternal grandparents to set up video chats. Grandfather testified that T.H. was doing well at his house because he could play outside and bond with his other siblings. Grandfather relayed that T.H. knew Father was incarcerated, but Grandfather believed T.H. was too young to fully understand the situation.

The only reason given by anyone as to the best interests of T.H. was Eiland's testimony that terminating Father's parental rights was in T.H.'s best interests because he needed permanency in his life.

> "Q: So it's pretty clear from this, correct me if I'm wrong, that the simple fact of his incarceration is the only factor that your agency is looking at to terminate my client's parental rights?
> "A: Because he cannot provide for [T.H.] until 2024, yes."

25

Eiland agreed that T.H. and Father have a close father-and-son relationship and continue to have regular contact while Father is in prison. In spite of this, she stated the overarching policy that DCF wants to see children reintegrated with their parents within one year or adopted within two years. This is not a legal requirement but an internal policy preference. See *In re K.R.*, 43 Kan. App. 2d at 905 ("[T]here is no fixed deadline of 1 year for reintegration, as suggested by some of the witnesses here."). We do not disagree with the dissent that this one-year deadline has been quoted frequently in Kansas caselaw, and K.S.A. 2020 Supp. 38-2201(b)(4) clearly encourages the court "dispose of all proceedings under this code without unnecessary delay." Slip op. at 37-38. But no Kansas statute sets a mandatory one-year time limit on reintegration, nor are there any legal sanctions for failure to adhere to such a standard. The definition of unnecessary delay must vary based on the facts of each case. See *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, Syl. ¶ 3, 130 P.3d 560 (2006) (finding that "'forthwith'" means "without unnecessary delay and requires reasonable exertion and due diligence consistent with all the facts and circumstances of the case in order to carry out the legislative intent"); *State v. Cuchy*, 270 Kan. 763, 767, 19 P.3d 152 (2001) (finding unnecessary delay is a flexible concept dependent on the circumstances).

Permanency planning is at the heart of the child in need of care statutory scheme. "The goal of permanency planning is to assure, in so far as possible, that children have permanency and stability in their living situations and that the continuity of family relationships and connections is preserved. In planning for permanency, the safety and wellbeing of the children shall be paramount." K.S.A. 2020 Supp. 38-2263(a). The development of a permanency goal is the outcome of the permanency planning process. The goal may be reintegration, adoption, appointment of a permanent custodian, or another planned permanent living arrangement. K.S.A. 2020 Supp. 38-2202(w). After Father was sent to prison, the court determined adoption was the *only* viable option, even though Eiland testified that a permanent custodianship, without termination of Father's

26

rights, was a viable permanency option for T.H. The Kansas Legislature has allowed for a permanent custodian to be appointed in these circumstances:

> "(1) With the consent and agreement of the parents and approval of the court;
> "(2) after a finding of unfitness pursuant to K.S.A. 2020 Supp. 38-2269, and amendments thereto; or
> "(3) after termination of parental rights pursuant to K.S.A. 2020 Supp. 38-2270, and amendments thereto." K.S.A. 2020 Supp. 38-2272(a).

If the parent is not unfit, a permanent custodian shares parental responsibilities with the parent of the child. K.S.A. 2020 Supp. 38-2272(e). Once a permanent custodian is appointed, the State's custody of the child ends. K.S.A. 2020 Supp. 38-2272(b). But if a court appoints a permanent custodian after termination of parental rights, the parent retains no right or responsibilities to the child. K.S.A. 2020 Supp. 38-2272(i).

To terminate Father's parental rights to T.H. based on an arbitrary timeline for permanency does not advance the goal of preserving the continuity of family relationships. To the contrary, termination of parental rights here means that Father retains no right or responsibility to T.H. This would cause a break in the bond between T.H. and Father that has been forged throughout the child's life. Father has completed every task requested, has provided physically, emotionally, and financially for T.H., and has maintained regular contact both before and during incarceration. All agree there is a strong bond between the two. T.H. is very young and even after five years of incarceration, T.H. will still have approximately 10 years before adulthood. In the meantime, he is currently in the loving care of his maternal grandparents and a close family friend who he views as his aunt. He is allowed to maintain the familial bond with his siblings—although we are reminded it was a sibling that caused him serious injury in the past by wiping liquid nail adhesive on T.H.'s back. This is not to say that the court was required to grant Father's request for a permanent custodianship; it clearly was not. But even if Father were unfit, which we have already found he was not, there were

27

options short of termination for the court to consider in trying to foster the relationship between a father and his son. It does not appear that the district court considered any option other than termination, and Eiland was unable to explain why other options were no longer considered, even though Father had been led to believe they were going to be considered.

"Q: So when Stephanie says, 'I have insurance,'—and a lot of that has to do with funding, correct me if I'm wrong?

"A: Yes.

"Q: Stephanie says, "I have insurance. I have a home. [Father] has money. We have the ability to take care of this child.". . . [W]hy is that not good enough?

"A: Because he would be split from his other four siblings.

"Q: Okay. Let's talk about that because this case started in October 2019. Where did DCF and this court, where did this Court place him?

"A: With his father.

"Q: He was placed with his father away from his four siblings?

"A: Yes.

"Q: Why is that argument coming up now?

"A: I don't have that answer."

The need for a timely determination of a child's status vis-à-vis a parent is to keep children from living in limbo with no stability for what, in child time, is a long time. This is to protect the interests of the child. Here there is no question that T.H. is in a stable environment now and will continue to be. Father, maternal grandparents, and Stephanie are all working together to make sure that happens. Eiland testified that she believed continued communication between Father and T.H. was important because of their close bond and to stop that communication would "hinder [T.H.]." T.H. is not in limbo and there was no reason to rush to termination simply because SFCS would not be able to close its file in a year. Finding that the best interests of T.H. would not be met based solely on an internal policy preference without giving consideration to the unique facts of the case is not reasonable.

28

We repeat the story of this case with which we began this opinion. We have here a father who had custody of his son with the blessing and encouragement of the State even though they knew he was going to be going to prison and who arranged for his son to be cared for by someone with whom they both have a close relationship. We further have a father who had the financial ability to provide for his son while he was in prison—and was doing so—and who has a home and job waiting for him when he gets out of prison. Instead of letting Father exercise his rights as a parent under difficult circumstances, the State swooped in and transferred physical custody of T.H. two days after Father went to prison—not before—and placed the child with the child's maternal grandparents. Even so, Father continued to provide for the child, and the State, through SFCS, continued to assure Father that it would agree to a permanent custodianship of T.H. with Stephanie rather than seek termination of his parental rights. And then, just one month after declaring Stephanie a viable placement option and seemingly out of nowhere—and as a complete surprise to Father, Stephanie, and Father's counsel—the State moved to terminate Father's parental rights for no other reason than his incarceration. Although the motion was stated in the alternative as a motion for termination of parental rights *or* appointment of a permanent custodian, the body of the motion sought only termination, and there is no indication that the district court ever considered anything other than termination.

If it is a reasonable finding under these facts to hold that T.H.'s best interests are served by termination of Father's parental rights, we can think of no circumstance in which an incarcerated parent would ever be able to retain their parental rights after incarceration. If that were the case, there would be no point in conducting termination proceedings. A much more efficient process, which would garner the same results, would be the automatic termination of the parental rights of all prisoners as soon as a parent is incarcerated for longer than a designated period. We do not believe that is what the law requires; it is not a burden the State could possibly bear; and it is not what a reasonable judge would conclude.

29

The dissent accuses us of reweighing the evidence and substituting our judgment regarding Father's credibility. Slip op. at 60. We disagree. The magistrate judge who heard this case made *no* credibility findings. More importantly, she did not find Father not to be credible. She found that Father's incarceration *alone* was sufficient to deem him unfit and that because of his incarceration and the inability to reintegrate within a reasonable time it was in T.H.'s best interests to terminate Father's parental rights and proceed to adoption. There was *no* conflicting evidence to weigh and no facts for us to redetermine. There was no dispute of fact. Instead, it is the dissent that cherry picks information from the record that was never discussed by the magistrate judge as a basis for her decision. We simply find that reviewing all the evidence in a light most favorable to the State, a rational fact-finder could not have found clear and convincing evidence to support the ultimate determination of unfitness made by the court—that Father's incarceration alone was a sufficient basis to find him unfit under these facts.

We conclude by noting that many parents are away from their children for extended periods of time, sometimes years, due to their own behavior or desires. Certainly, a court would not terminate the parental rights of a United States Armed Forces member who has multiple and extended periods oversees with minimal contact with the child. There can be no dispute that extended deployments are a known consequence of voluntary military enlistment and may have a negative impact on the service member's children—particularly those with a single parent. Of course, we do not equate criminal activity with the patriotism and commitment associated with military service. But courts must require more than prolonged absence and an internal policy of SFCS requiring permanency or termination within a year to find a parent unfit—and that is all we have here.

Reversed.

30

* * *

BUSER, J., dissenting:  For a five-year-old boy, it has been a brief but eventful life. His father and mother had a short-lived relationship, separated soon after his birth, and never married. Born to a mother addicted to methamphetamine, by the age of four T.H. had sustained a concussion, incurred chemical injuries to his back, and suffered serious burns to his feet. During those years, his father was distributing methamphetamine. When T.H. was five years old, his mother voluntarily gave up her rights to parent him. This left T.H. with only one parent, Father, who is in prison until at least May 16, 2024—or, as T.H. puts it, "My dad's in jail and I can't see him until he gets home."

I dissent because I believe that T.H. has endured enough suffering and dysfunction in his young life and Father is obviously unfit "to care properly" for him from prison now or in the foreseeable future. See K.S.A. 2020 Supp. 38-2269(a). Moreover, I am convinced that it is in T.H.'s best interests to have Father's parental rights terminated to ensure the child's current and future "physical, mental and emotional health." See K.S.A. 2020 Supp. 38-2269(g)(1).

FATHER'S UNFITNESS TO PARENT BY REASON OF FELONY CONVICTION AND IMPRISONMENT (K.S.A. 2020 SUPP. 38-2269[b][5])

I begin the analysis with a plain reading of K.S.A. 2020 Supp. 38-2269(a) and (b)(5):

> "(a) When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.

31

"(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

. . . .

(5) conviction of a felony and imprisonment."

*Father's Felony Convictions for Distribution of Methamphetamine*

My colleagues candidly concede that Father "is incarcerated for a felony and will be until 2024." Slip op. at 15. As a result, the district court was statutorily mandated to consider Father's incarceration for a felony as a factor of parental unfitness. See K.S.A. 2020 Supp. 38-2269(a) and (b)(5). Importantly, "under Kansas law, simply committing a felony and being imprisoned can constitute the sole basis for a finding of unfitness, regardless of the circumstances of the crime." *In re M.H.*, 50 Kan. App. 2d 1162, 1171, 337 P.3d 711 (2014). Here, applying K.S.A. 2020 Supp. 38-2269(b)(5) to the undisputed evidence that Father was convicted of a felony and imprisoned, the district court had clear and convincing evidence that Father was unfit to parent T.H.

Although not explicitly stated in K.S.A. 2020 Supp. 38-2269(b)(5), it makes sense that, all things being equal, the type of felony which resulted in imprisonment may be relevant to the parental fitness analysis. In this case, during T.H.'s brief lifetime, Father was convicted of three serious drug felonies involving the distribution of methamphetamine.

First, on September 14, 2016, Father was convicted of possession of methamphetamine with the intent to distribute in violation of K.S.A. 2015 Supp. 21-5705(a)(1), (d)(3)(A), a nonperson, severity level 4 drug felony. The offense occurred on April 23, 2016, when T.H. was nine months old. At the time of Father's arrest, he was unemployed. Although the felony offense mandated presumptive prison, the district court approved a downward dispositional departure sentence. As a result, on November 9, 2016, Father was sentenced to 18 months in prison and 24 months of postrelease

32

supervision but was granted an 18-month probation. Under Kansas law, upon Father's conviction he was statutorily required to register as a drug offender for 15 years. See K.S.A. 2020 Supp. 22-4906(a)(1)(R).

Less than three-and-a-half years after Father's felony drug conviction, on January 28, 2020, Father was convicted of two counts of distribution of methamphetamine in violation of K.S.A. 2018 Supp. 21-5705(a)(1), (d)(3)(B), nonperson, severity level 3 drug felonies. The offenses occurred on January 10 and 17, 2019, when T.H. was three-and-a-half years old. Once again, at the time of Father's arrest, he was unemployed. The felony offenses mandated presumptive prison terms, and on March 4, 2020, Father was sentenced to concurrent sentences of 68 months in prison followed by 36 months of postrelease supervision. Upon Father's parole, discharge, or release from prison he is statutorily required to register as a drug offender for 15 additional years. See K.S.A. 2020 Supp. 22-4906(a)(1)(R).

The majority highlights that although Father distributed methamphetamine, he testified that he was only an occasional methamphetamine user; or in his own words he ingested methamphetamine "[o]nce in a blue moon." Moreover, Father said he never ingested the drug in the presence of T.H. Slip op. at 3. This is faint praise in support of Father's parental fitness.

That methamphetamine is a highly addictive drug that has destroyed innumerable lives of addicts and their families needs no citation to caselaw. Here, Mother's addiction to methamphetamine (which Father testified he had "suspicions" about because there was "an awful lot of traffic coming in and out of her house"), led to Mother's voluntary relinquishment of her parental rights to five children, including T.H. I agree with my colleagues, "suffice it to say that [Mother] had a significant drug problem that led to her inability to parent any of her children." Slip op. at 4.

33

Like Mother's ruinous parenting experience, Father's possession, use, and distribution of methamphetamine has adversely affected his ability to parent T.H. It is remarkable that shortly after T.H.'s birth—when one would expect a father to be attentive to bonding with his newborn infant—Father committed his first felony, possession with intent to distribute methamphetamine. Yet, with knowledge of Mother's all-consuming addiction to methamphetamine and her obvious inability to parent T.H. (which resulted in the toddler sustaining a concussion and chemical burns), Father once again endangered his right to parent T.H. by risking arrest and incarceration for distributing methamphetamine on two more occasions in January 2019.

While the majority asserts that, prior to his imprisonment, Father was a fit parent, St. Francis Community Services (SFCS) Permanency Specialist Meagan Eiland, when asked if she had seen Father adjust his parental conduct to meet the needs of T.H. testified, "If he was distributing meth and then distributed meth again, I don't believe that's adjusting his circumstances" to meet the needs of his child. Even Father's friend, Stephanie, testified to the obvious: "No, I don't think a safe parent is one that is dealing methamphetamine."

In summary, the nature of the felonies that resulted in Father's incarceration—two counts of distribution of methamphetamine—bolsters the district court's finding of parental unfitness under K.S.A. 2020 Supp. 38-2269(b)(5). I am unwilling to minimize the adverse effects on Father's right to parent T.H.—which he brought upon himself by committing three felonies—while T.H. was a child of tender years. These are serious drug felonies that the Kansas Legislature has determined merit lengthy presumptive imprisonment. As Eiland and Stephanie testified, this repeated criminal behavior reflects poorly on Father's parenting abilities.

*Father's Criminal History*

Father's three felony drug offenses cannot be viewed in isolation, however, because they are but the latest examples of Father's lengthy criminal history. At the time of the termination hearing, Father was 45 years of age. His criminal history is shown in the following chart:

| CRIME | CONVICTION |
|---|---|
| Theft | September 8, 1992 |
| Battery | November 6, 2002 |
| Criminal Trespass | November 6, 2002 |
| Domestic Battery | December 9, 2003 |
| Disorderly Conduct | July 16, 2004 |
| Disorderly Conduct | February 15, 2005 |
| Giving a Worthless Check | September 25, 2006 |
| Criminal Trespass | March 14, 2014 |
| Possession of Marijuana | March 14, 2014 |
| Possession of Methamphetamines with Intent to Distribute | September 8, 2016 |
| Battery | September 8, 2016 |
| Distribution of Methamphetamine (2 counts) | January 28, 2020 |

As shown by this chart, Father's criminal behavior spans 28 years—beginning with a juvenile adjudication in 1992, followed by misdemeanor offenses involving dishonesty and crimes against persons (including three battery convictions), and culminating with the two felony drug convictions in 2020. Inexplicably, Father's criminal behavior has increased in severity as he has grown older and has become middle-aged.

Of course, parenting requires the exercise of good judgment to ensure the child is safe, healthy, and developing normally. Father's escalating 28-year criminal history, however, shows a profound lack of judgment contributing to the conclusion that Father is unfit to parent T.H. This lack of insight was demonstrated at the termination hearing

when Father was either unable or unwilling to acknowledge the negative consequences that T.H. has suffered because of Father's drug dealing:

"Q. Were you not [T.H.'s] father when you were dealing methamphetamines?

"A. He was not in my care. I did not have him.

"Q. But you were still his dad, correct?

"A. Correct.

"Q. And certainly you understood the risk that you would be where you are now, which is unable to care for him.

"A. Hindsight is 20/20, yes.

"Q. So, I'm sorry, are you saying that you didn't realize at the time that you were doing it that it was illegal? It wasn't until after you were arrested?

"A. Not all of it, no. I can't say I fully thought out my consequences.

"Q. Okay.

"A. I don't know that everybody stops and thinks of every single consequence and possibility that can happen with every choice they make. We're human, we make mistakes.

"Q. Sure. Is it fair to say you were afforded an opportunity to reflect on your mistakes in 2016 when you were placed on probation?

"A. Say that again?

"Q. Is it fair to say you were afforded an opportunity to reflect on those mistakes that you're talking about when you were first convicted for distributing methamphetamine in 2016?

"A. I don't know."

Facing the prospect of having his parental rights terminated, Father's testimony demonstrated his lack of insight, continuing poor judgment, and refusal to take responsibility for jeopardizing his ability to parent T.H. by risking arrest and imprisonment for repeatedly distributing methamphetamine.

Father's worsening criminal record, the three drug distribution felonies he committed when T.H. was a child of tender years, and his inability or unwillingness to

36

appreciate that his criminal behavior adversely impacted his responsibility to parent T.H., comprise substantial evidence of his unfitness to parent T.H. now and in the foreseeable future. Given this evidence, the district court's finding of Father's parental unfitness was in keeping with our court's longstanding precedent that "continued unfitness can be judicially predicted from a parent's past history." *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

*Father's Lengthy Imprisonment for the Foreseeable Future*

The majority asserts: "Father's charges and convictions, up until the day he went to prison for five years, did not prevent reintegration into Father's home while the case was pending." Slip op. at 18-19. I agree. Unfitness under K.S.A. 2020 Supp. 38-2269(b)(5) requires both the commission of a felony *and* imprisonment. Reintegration was potentially viable and was being explored by the Department for Children and Families (DCF) and SFCS until the district judge in Father's criminal case imposed concurrent felony sentences of 68 months in prison followed by 36 months of postrelease supervision. At that point in time, the importance of providing a permanent and stable home for T.H. in the foreseeable future—in child years—became a very important consideration for the district court.

Kansas law has never provided that the simple fact that a parent is incarcerated mandates a finding of unfitness. As Eiland testified, "We have had parents in the past be incarcerated and then they were out shortly after, you know, three or four months, and we worked reintegration in that case." After the district court declined to grant Father another probation and imposed lengthy sentences of imprisonment, however, Father was unfit to parent T.H. and this condition of incarceration was unlikely to change in the foreseeable future. See K.S.A. 2020 Supp. 38-2269(a).

37

My colleagues downplay the significance of Father's lengthy sentences. They point to Eiland's testimony that "[w]e like to have children back into their parents' home within a year of being removed" or adopted within two years. My colleagues dismiss this testimony, stating: "This is not a legal requirement but an internal policy preference." Slip op. at 26. They insist that "courts must require more than prolonged absence and an internal policy of permanency or termination within a year to find a parent unfit." Slip op. at 30. My colleagues' view is at variance with Kansas law.

The imperative for reintegration of the child with the family or permanency within a reasonable period of time was established by the Kansas Legislature upon the enactment of the revised Kansas Code for Care of Children (KCCC). See K.S.A. 2020 Supp. 38-2201 et seq. Thus, "an internal policy" criticized by the majority is in faithful adherence to Kansas law. Slip op. at 26. In ruling from the bench after the evidentiary hearing, the district court discussed the legal significance of Father's concurrent 68-month sentences:

> "[T]he ultimate crux here is that [Father] is going to be incarcerated for a significant period of time. The testimony was that the earliest release that he could receive from custody would be [May 16th] of 2024.
>     "As indicated by the county attorney, *I'm asked to look at this case in the length of time, in accordance with the age of the child, and the child is relatively young, he's only five years old.* So the goal of the court, the goal of DCF, the goal of [SFCS], and primarily everyone involved in the case is for permanency of the child." (Emphasis added.)

In its written termination order, the district court applied the legislative directive found in the statutory mandates of the KCCC. The district court emphasized Father's "significant length of incarceration from his felony convictions and the young age of the minor child." The district court then properly applied the KCCC to the facts of this case and ruled:

38

"[*T.H.*] is a five-year-old boy who has been in out of home placement for the last 8 months, and given [*Father's*] incarceration it would be impossible for reunification to occur with his father until May 16, 2024, at the earliest. K.S.A. 38-2201(b)(4) states: '*The* [*KCCC*] shall be liberally construed to carry out the policies of the state which are to: acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings under this code without unnecessary delay.'" (Emphases added.)

The district court properly framed the legal issues in this case. Although never discussed by the majority, the likelihood that an unfit parent will change in the foreseeable future is a critical factor in the termination of parental rights analysis. In addition to determining whether a parent is presently unfit, a district court must determine whether this conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). Once again, Kansas statutes—not just DCF or SFCS internal policies—mandate the need for timely reintegration and permanency for the child. As our court has stated:

"When assessing the foreseeable future, this court uses 'child time' as the measure. The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.— recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ('"child time"' differs from '"adult time"' in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')." *In re M.S.*, 56 Kan. App. 2d 1247, 1263-64, 447 P.3d 994 (2019).

My colleagues' assertion that the district court committed reversible error by basing its judgment on the "internal policy" of DCF or SFCS is mistaken. The district

court's emphasis on the young age of T.H., the length of Father's imprisonment, and the imperative to achieve a permanent and stable home for T.H. within a reasonable period of time—in child years—was in faithful adherence to the KCCC and Kansas caselaw. The district court's ruling was lawful, succinct, and on-point: "The ultimate issue is what is the foreseeable future, and for a five-year old, the foreseeable future is very short. Four years is not the foreseeable future. So in his immediate future, this situation where the father is in prison is not going to change."

*Father's Fitness to Parent T.H. While in Prison for the Foreseeable Future*

While my colleagues concede "[t]here can be no dispute that Father's actions have caused him to be unable to parent T.H. in person," they conclude as a matter of law that the district court committed reversible error when it found that Father was unfit to parent T.H. while in prison for the next four years. Slip op. at 24.

How does one parent a young child when the parent and child are separated and not in person? More to the point: How does a parent "care properly for" a five-year-old boy now and for the next four years when the boy's parent resides behind prison walls? See K.S.A. 2020 Supp. 38-2269(a). Even Father, after only four months of incarceration, conceded his unfitness to parent T.H. while imprisoned. Father informed SFCS that he "*understands he is unable to care for* [*T.H.*] *at this time.*" (Emphasis added.) Indeed. Father understands what the district court understood but my colleagues wholly fail to appreciate.

My colleagues' holding that Father, incarcerated until May 16, 2024, is a fit parent to properly care for a five-year-old child, now and in the foreseeable future, *is without precedent in Kansas caselaw.* Importantly, the majority opinion does not cite one case wherein our court or the Kansas Supreme Court has reversed the district court's judgment terminating the parental rights under K.S.A. 2020 Supp. 38-2269(b)(5), or its

40

predecessor, of a parent of a young child who is incarcerated for a lengthy prison term—four years or more.

To the contrary, there is Kansas caselaw that provides that a parent of a young child incarcerated for a lengthy period of time is unfit under K.S.A. 2020 Supp. 38-2269(b)(5) or its predecessor because the parent is unable to reintegrate with the child in child time and provide a permanent home for the child in the foreseeable future.

For example, in *In re C.C.*, 29 Kan. App. 2d 950, 34 P.3d 462 (2001), both parents were incarcerated for felony drug charges relating to the manufacture of methamphetamine. At the time of the termination hearing, the three children were aged 1 1/2 years, 5 years, and 10 years old. The earliest release date from prison for Mother was two years after the date of the termination hearing.

Our court affirmed the termination order, stating:

"The district court found that '[i]t is clearly not in the best interest of children who are 10, 5, [and] 1 1/2 years old to linger in foster care for at least two years before reintegration with the mother can possibly proceed.' The district court correctly intimates that the 'foreseeable future' should be viewed from the children's perspective, not the parents'. '[T]ime perception of a child differs from that of an adult.' K.S.A. 1999 Supp. 38-1584(a). The CINC code suggests a time frame. 'Reintegration may not be a viable alternative when . . . (6) the child has been in extended out of home placement as defined in subsection (z) of K.S.A. 38-1502 and amendments thereto.' K.S.A. 1999 Supp. 38-1565(a).' "Extended out of home placement" means a child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date at which a child in the custody of the secretary was removed from the home.' K.S.A. 1999 Supp. 38-1502(z). The children were removed from the home on August 3, 1999. The mother testified her first eligibility to be released from prison is February 2002. By then, the children will have been in an out of home placement for 30 months. Mother's argument fails." 29 Kan. App. 2d at 954.

*In re C.C.* is informative as to the limits of a child remaining in extended out of home placement. In the present case, given the majority's holding reversing the district court's termination order, when Father is released from prison on May 16, 2024, T.H. will have been in out of home placement for 50 months of his young life—20 months longer than *In re C.C.*!

Another analogous case is *In re A.D.C.*, No. 98,206, 2008 WL 360717 (Kan. App. 2008) (unpublished opinion), wherein the district court terminated the parental rights of an incarcerated parent with his three-year-old child. Like the case on appeal, the father was convicted of felony drug offenses, and at the time of the termination hearing he was to remain incarcerated for two to three years. In upholding the termination, the district court cited K.S.A. 2005 Supp. 38-1583(b)(5) (the predecessor to K.S.A. 2020 Supp. 38-2269[b][5]). The district court observed that the father "did attempt visitation but because of incarceration for both state and federal felony crimes, father failed to carry on the role of a parent." 2008 WL 360717, at *3.

In upholding the district court's termination order, our court observed: "Father's felony convictions and substantial incarceration are *a major factor* and are correctly applied in this case." (Emphasis added.) 2008 WL 360717, at *3. The district court noted the child was an infant when placed in custody and would be five years old if Father were released from prison at the first opportunity. Our court observed that "[t]he whole personality of the child would have been developed by other parties which 'is the direct result of the father's conduct.' The district court made it clear that incarceration, standing alone, may justify parental rights termination." 2008 WL 360717, at *3.

Finally, in *In re Y.D.W.*, No. 95,137, 2006 WL 1170263 (Kan. App. 2006) (unpublished opinion), the district court applied K.S.A. 2004 Supp. 38-1583(b)(5) (the predecessor to K.S.A. 2020 Supp. 38-2269[b][5]) and terminated the parental rights of an

incarcerated parent to his three young children. Like the case at bar, the father was convicted of multiple felony drug offenses. At the time of the termination hearing, father was serving a 54-month prison sentence. In summarily upholding the termination, our court cited K.S.A. 2004 Supp. 38-1583(b)(5) as the *only* statutory basis for termination and did not mention any other statutory factors of unfitness.

*In re C.C.*, *In re A.D.C.*, and *In re Y.D.W.* are three examples of Kansas caselaw that have many similarities with the case on appeal. First, all three cases involved a young child or children—some the same age as T.H. Second, their parents committed serious drug felonies. Third, the convictions resulted in lengthy imprisonment which prevented the parents from reintegrating with their child/children for two to three years from the date of the termination hearing. Fourth, the district court applied the predecessor statute to K.S.A. 2020 Supp. 38-2269(b)(5) in terminating the parents' rights. Fifth, our court affirmed the district court's termination order in each case while citing Kansas statutes and caselaw that provide for termination when the parent is unable to reintegrate in child time to provide the child a permanent and stable home.

Returning to the case on appeal, the evidence presented at the termination hearing also shows that for T.H., the foreseeable future will be longer than the four years that Father is incarcerated. Once Father is released from custody on May 16, 2024, Father and T.H. would not be immediately reintegrated into Father's home. On the contrary, Eiland testified that "[Father] would be required to obtain housing, and [show] that he can maintain housing, as well as transportation and employment, and then we would have to begin visitations, and then he would also be required to show that he is able to remain drug and alcohol free." Quite simply, Father's lengthy incarceration would substantially delay the reintegration process such that the earliest T.H. would have a permanent and stable home is after the boy's ninth birthday. Assuming a successful reintegration at nine years of age, T.H. will have spent more years of his life *out* of Father's home than *in* Father's home.

43

In summary, my colleagues' holding that a parent with a lengthy criminal history who is convicted of two drug felonies and sentenced to five years' imprisonment is a fit parent to properly care for a five-year-old child now and in the foreseeable future is without precedent in Kansas caselaw. To the contrary, the district court's ruling that Father was unfit to parent T.H. under these circumstances is well supported by longstanding Kansas caselaw precedent. The district court did not commit reversible error.

*Whether Father's Efforts to Carry Out Parental Duties is Determinative When T.H. is Young and Father Will Be Incarcerated for the Foreseeable Future*

While minimizing the significance of T.H.'s youth, Father's convictions for distribution of methamphetamine, and the lengthy imprisonment which prevents him from properly caring for T.H. until the child is nine years of age or older, the majority predicates its holding on the basis that Father has completed some parenting tasks while incarcerated. As a result, the majority concludes that Father is not an unfit parent under K.S.A. 2020 Supp. 38-2269(b)(5). In my view, the district court properly applied K.S.A. 2020 Supp. 38-2269(b)(5), given T.H.'s age, Father's felony drug convictions, his 68 months' imprisonment, lengthy criminal history, and unfit parenting prior to his incarceration. Moreover, Kansas caselaw provides that under this particular statutory factor, Father's efforts at completing some parenting tasks while in prison are not determinative of his fitness to parent T.H.

My colleagues anchor their holding by citing *In re F.A.R.,* 242 Kan. 231, 236, 747 P.2d 145 (1987), for the proposition that a district court, in making a determination of unfitness in a parental termination case, must determine whether an incarcerated parent has pursued the available opportunities and options to carry out parental duties to the best of the parent's abilities while in prison. Slip op. at 15. Later in the opinion, my colleagues

44

cite this precedent again. Slip op. 18. But on the second occasion, they concede that *In re F.A.R.* is *not* a termination of parental rights case but a stepparent adoption case. Slip op. 18.

In *In re F.A.R.*, an incarcerated biological father refused to consent to the adoption of his two minor children. The stepfather seeking the adoption argued that the biological father's consent was not required because he had failed to assume the duties of a parent for two consecutive years. See K.S.A. 1986 Supp. 59-2102(a)(3). The district court found that the biological father had, given the constraints of his incarceration, not failed to assume his parental duties for two years. The Kansas Supreme Court agreed. 242 Kan. at 240.

Despite the fact that *In re F.A.R.* did not deal with termination of parental rights, my colleagues cite the opinion and argue: "The termination of all of a parent's rights to custody and control of their child by a finding of unfitness should be no different" than in a stepparent adoption case. Slip op. at 18.

I disagree. More importantly, Justice Holmes, writing for our Supreme Court in *In re F.A.R.,* also disagreed with the proposition posited by my colleagues when he carefully distinguished the stepparent adoption precedent from cases involving the termination of parental rights of an incarcerated parent. Justice Holmes gave two reasons for the distinction:

> "[T]he best interests of the child, which is the paramount consideration in custody matters, is not controlling in determining the statutory issue of whether a natural parent has failed to assume parental duties. We have no doubt that the best interests of the children in this case weighs heavily in favor of the adoption. It is unfortunate that this father apparently has little concern for the children's welfare and instead has chosen to stand upon his legal rights, but under our statutory scheme of adoption he has that choice.

> "We also note that the fitness of the appellee as a parent is not a controlling factor under K.S.A. 1986 Supp. 59-2102(a)(3) [determining whether consent of a parent to an adoption is unnecessary for failure to assume parental duties] as it would be in a proceeding to sever parental rights pursuant to K.S.A. 38-1581 et seq. [the predecessor to K.S.A. 2020 Supp. 38-2266]. *In re Adoption of Wilson*, 227 Kan. 803, 806, 610 P.2d 598 (1980)." *In re F.A.R.*, 242 Kan. at 235.

Should there be any doubt that *In re F.A.R.*'s precedent did not apply to parental termination cases, our Supreme Court made it explicit in two syllabi:

> "3. In a determination under K.S.A. 1986 Supp. 59-2102(a)(3) of whether consent of a parent to an adoption is unnecessary for failure to assume parental duties, *the best interests of the child is not a controlling factor* in the decision.
> "4. In making a determination pursuant to K.S.A. 1986 Supp. 59-2102(a)(3), *the fitness of the nonconsenting parent is not a controlling factor* as it would be under proceedings pursuant to K.S.A. 38-1581 et seq. [the predecessor to K.S.A. 2020 Supp. 38-2266]." (Emphases added.) *In re F.A.R.*, 242 Kan. 231, Syl. ¶¶ 3-4.

Quite simply, *In re F.A.R.* does not apply to the felony incarceration provision of K.S.A. 2020 Supp. 38-2269(b)(5), the statute which the district court found governs in this parental termination appeal.

After *In re F.A.R.*, our court, in *In re M.D.S.*, 16 Kan. App. 2d 505, 509, 825 P.2d 1155 (1992), while noting that "no published decisions have directly addressed this issue" ignored Justice Holmes' admonition and the caselaw precedent from *In re F.A.R.*, and for the first time, applied the rule from *In re F.A.R.* to a termination of parental rights case.

In *In re M.D.S.*, the incarcerated father appealed the district court's termination of his parental rights due to unfitness. At the time of the termination hearing, father had five months remaining on a one-year sentence, and he previously had been convicted of felonies which resulted in incarceration. The father argued that his incarceration "was the

only factor preventing him from complying with the trial court's order" requiring completion of family reintegration tasks. 16 Kan. App. 2d at 509. The district court was not persuaded and terminated his parental rights. Our court framed the question on appeal: "[W]hat effect, if any, does a parent's incarceration have upon the trial court's consideration of the factors contained in K.S.A. 1991 Supp. 38-1583 [the predecessor to K.S.A. 2020 Supp. 38-2269]?" *In re M.D.S.*, 16 Kan. App. 2d at 509.

In analyzing this question, our court in *In re M.D.S.* cited to *In re J.L.D.*, 14 Kan. App. 2d 487, 491, 794 P.2d 319 (1990), for the holding that "[t]he father was serving an extended term in prison and would not be available to render proper care for the child within the foreseeable future." The *In re M.D.S.* court then considered whether a father's incarceration may be "a mitigating factor which frustrated [the parent's] ability to comply with a reintegration plan and, therefore, should not be used as a basis for termination." 16 Kan. App. 2d at 510.

In the final analysis, our court stated: "In appropriate circumstances, the incarceration of a parent may be considered as a mitigating factor when evaluating a parent's effort to adjust to the needs of the child or to complete a reintegration plan." 16 Kan. App. 2d 505, Syl. ¶ 3. Of note, our court limited the mitigation factor to two other statutory provisions of unfitness—failing to adjust the parent's conduct or condition to meet the needs of the child and failing to complete a reintegration plan.

Ultimately, our court in *In re M.D.S.* determined that its newly found proposition did not apply under the circumstances because the parent was serving a lengthy sentence of imprisonment. According to our court, there were five reasons to terminate the parental rights of the incarcerated parent:

> "(1) The statutory scheme indicates imprisonment for a felony alone can justify
> termination of parental rights [K.S.A. 1991 Supp. 38-1583(b)(5)]; (2) a lengthy

47

incarceration would make any substantial contact with a child, or the development of a relationship, very unlikely; (3) M.D.S., at the time of the termination hearing, was six years old, and for four of those six years the State had legal custody of her; (4) a termination proceeding involves a child's best interests and parental fitness; and (5) a child's best interests would not be served by requiring a delay in the proceedings whenever a parent is incarcerated." 16 Kan. App. 2d at 510.

Despite its questionable precedential origins, *In re M.D.S.* provides valuable precedent that, in cases of a finding of parental unfitness under K.S.A. 2020 Supp. 38-2269(b)(5), the length of imprisonment, age of the child, and the child's best interests in a permanent and stable home are controlling factors which take precedence over whether an incarcerated parent has pursued the opportunities to carry out parental duties to the best of the parent's abilities while in prison.

*Father's Fitness to Parent T.H. Prior to Incarceration*

The majority also highlights what it considers was Father's fitness as a parent prior to his incarceration. I question the significance of this evidence especially given Father's lengthy incarceration and T.H.'s young age, which, in my estimation, are the controlling factors in the analysis of parental unfitness under K.S.A. 2020 Supp. 38-2269(b)(5). However, assuming such evidence is probative under these circumstances, I disagree with my colleagues' very positive evaluation of Father's pre-incarceration parental fitness.

First, as mentioned earlier in the section discussing Father's convictions for distribution of methamphetamine while T.H. was a child of tender years, Eiland and Stephanie both testified that Father's repeated distribution of methamphetamine was not safe or good parenting. Moreover, it is an understatement to assert that a father who is a fit parent does not risk arrest and incarceration by repeatedly committing felony drug crimes, and thereby imperil that parent's right to love, protect, care for, and nurture his young child.

48

Second, in my colleagues' view, prior to Father's incarceration he was an attentive parent who would, whenever T.H. was injured while in Mother's care, rescue the child by taking him to his home for a while. Yet, in my view, Father negligently returned T.H. to Mother's care on each occasion after the child's concussion and chemical burns despite his belief that T.H. was "completely unsupervised" when residing with Mother. Not surprisingly, this routine of returning T.H. to Mother's primary care ultimately resulted in T.H. suffering additional injuries. On the third occasion, T.H. sustained severe burns to his feet while—once again—unsupervised by Mother.

The bottom line: Father did not obtain court-ordered legal custody of T.H. or at least keep T.H. in his care, custody, and control to safeguard him from Mother. To the contrary, with knowledge of Mother's parental unfitness that endangered T.H., Father repeatedly returned T.H. to Mother's neglectful and injurious care, which ultimately resulted in the third injury to T.H. and brought about the filing of the child in need of care (CINC) petition.

Third, evidence at the termination hearing showed that prior to his incarceration Father was an irregular parent. At the inception of the CINC proceedings, SFCS concluded that "[*Father*] *has been in and out of* [*T.H.'s*] *life for a while* as [T.H.] primarily lived with his [Mother]." (Emphasis added.) Grandfather corroborated this assessment of Father's intermittent parenting of T.H. He testified that neither Father nor Mother "would go to the courthouse and take the initiative to do whatever you've got to do." Grandfather attributed Father and Mother's informal custody practices to their lifestyle wherein, after taking care of T.H. for a while, parenting the young boy became a burden:

> "[GRANDFATHER:] "I think that was kind of hit-and-miss deal. I think, and this is my opinion, strictly my opinion, you know, I kind of think that [T.H.] was with

one of them [Mother and Father] until they would get tired of him, and then they would take him to the other one.

> "Q. Okay. Because being a parent was kind of a burden for both of them?
> "[GRANDFATHER:]  Yeah I think that's how they did it.
> "Q. The lifestyle that each of them were living at the time—
> "[GRANDFATHER:]  Uh-huh.
> "Q.  —was not necessarily conducive to being a responsible parent?
> "[GRANDFATHER:]  Correct."

Grandfather's even-handed testimony supports an inference of Father's unfitness to parent T.H. prior to his incarceration. His frank testimony (which was also critical of his own daughter's parental fitness) is important given that—due to Father and Mother's unfitness to parent T.H.—Grandfather, together with Grandmother, has taken on the responsibility to successfully parent not only T.H. but Mother's four other children, by another father, for more than a year.

Fourth, while my colleagues embrace Father's largely uncorroborated testimony regarding his employment, methamphetamine use, drug test results, financial support for T.H., and lack of prison discipline, the record on appeal contains scant documentation or testimony to verify or corroborate Father's claims. Father introduced no employment records, pay stubs, payroll records, bank statements, deposit slips, tax returns, invoices, receipts, or prison records to verify his testimony. In fact, Father introduced no exhibits in evidence at the termination hearing.

The unsubstantiated quality of Father's testimony must have been apparent to the district court. For example, based on Father's testimony the majority states:  "Father was employed before his incarceration and has the same well-paying job available to him—$1,200 every two weeks—upon his release. His boss testified on his behalf at sentencing." Slip op. at 7. But in a November 26, 2019 report—more than three months *before* Father was sentenced to prison—SFCS advised the district court that "[Father]

50

recently lost his job at Bonnie Plants. According to [Father] his boss fired him due to his current legal issues. [Father] does not plan on applying for another job until he knows if he is going to be sentenced to prison."

Of course, it is possible that, after he fired him, Father's employer testified on Father's behalf at the sentencing. But I question why Father's employer—who fired him due to his felony convictions three months before sentencing—would make available that "same well-paying job" upon his release from prison on May 16, 2024. Nevertheless, despite Father's unverified employment claims, as noted earlier, on both occasions in 2016 and 2019 when Father was arrested on drug charges, it was uncontroverted that he was unemployed.

Moreover, there is good reason to view Father's self-serving testimony at the termination hearing with skepticism. In July 2020, SFCS informed the district court that "[Father] has indicated he would like [T.H.] to reside *with his sister*, [Stephanie], and wishes to have [T.H.] achieve permanency with Stephanie as the permanent custodian." (Emphasis added.) In fact, Father told Eiland a lie—that Stephanie was his sister. Stephanie was a part of this deception. In an update to the district court dated July 30, 2020, SFCS advised the court: "[Stephanie], *paternal aunt* to [T.H.], would like to be considered as a placement option for [T.H.] Stephanie understands [Father], *her brother*, will be incarcerated until May 2024, and would be able to provide for [T.H.] during this time."

After investigating the possibility of Father's "sister" having custody of her "nephew," Eiland discovered that Stephanie was not, in fact, Father's sister. Eiland testified she "didn't feel [Father] was honest . . . when he described his relationship with [Stephanie] I felt, or he stated that she was his sister, or that they were brother and sister, and they're just very close family friends." A reasonable inference from this testimony is that Father's lie was designed to deceive Eiland, DCF, SFCS, and the district court to

51

have his friend, Stephanie, pose as a biological relative. In this way, Father sought to enhance the likelihood of Stephanie acquiring custody of T.H. rather than the boy's maternal Grandfather and Grandmother.

My colleagues dispute my characterization of this testimony, claiming that "Father gained no advantage by calling Stephanie his sister" because, in their view, she was a person with whom the child has close emotional ties who would be equally considered a suitable person to have custody of T.H. Slip op. at 20. See K.S.A. 2020 Supp. 38-2255(d). But K.S.A. 2020 Supp. 38-2272(j) instructs that the district court "shall give preference, to the extent that the court finds it in the child's best interests, to *first* appointing a permanent custodian who is a relative of the child or *second* a person with whom the child has close emotional ties." (Emphases added.)

On the other hand, the differing opinions of my colleagues and I regarding Father's credibility are not at issue because Father's credibility is not a proper subject of appellate review. See *In re B.D.-Y*, 286 Kan. 686, 705-06, 1187 P.3d 594 (2008). Suffice it to say that the district court did have the opportunity and responsibility to evaluate Father's credibility and claims, and the court found that Father was unfit to parent T.H. now and in the foreseeable future.

Finally, there was additional evidence of Father's unfitness as a parent prior to his incarceration. Father has two older sons. His oldest son is 26 years old and Father simply described him as staying with Father during summers when Father moved from Plainville, Kansas, to Florida. Father testified that he has not seen his other son, now 22 years old, since "[h]e was little." Father explained his total lack of any personal contact with his son over the ensuing years: "[M]e and his mother could not get along in any way, shape or form, and she took him and run off to, the last place I heard was Texas. So she's kept him out of contact with me." Father's parenting history does not support my colleagues' assertion that Father was a fit parent prior to his incarceration.

The district court heard substantial competent evidence contrary to the majority's belief that Father was a fit parent prior to his incarceration. Assuming this evidence was probative, given the district court's holding that was primarily predicated on K.S.A. 2020 Supp. 38-2269(b)(5), the district court could rightfully conclude that Father's parental unfitness prior to incarceration would continue after his release from incarceration. See *In re Price*, 7 Kan. App. 2d at 483.

*Summary of Evidence Supporting the District Court's Judgment That Father was Unfit by Reason of Felony Convictions and Imprisonment* (*K.S.A. 2020 Supp. 38-2269*[*b*][*5*])

After reviewing the evidence in a light most favorable to the State would a rational fact-finder have found it highly probable that Father was unfit to parent T.H. by reason of felony convictions and imprisonment? See *In re B.D.-Y.*, 286 Kan. at 705-06. The answer to this question is important because, in general, clear and convincing evidence of a single statutory factor under K.S.A. 2020 Supp. 38-2269(b) can be a sufficient basis for a district court's determination that a parent is unfit. K.S.A. 2020 Supp. 38-2269(f). And, in particular, "under Kansas law, simply committing a felony and being imprisoned can constitute the *sole* basis for a finding of unfitness." (Emphasis added.) *In re M.H.*, 50 Kan. App. 2d at 1171.

Father's two felony drug convictions with concurrent 68-month prison terms have resulted in his imprisonment until May 16, 2024. This undisputed evidence provides the essential predicates for the district court's finding that, pursuant to K.S.A. 2020 Supp. 38-2269(b)(5), Father is statutorily unfit to parent T.H. now and in the foreseeable future. See K.S.A. 2020 Supp. 38-2269(a).

Despite this uncontroverted evidence and a plain reading of K.S.A. 2020 Supp. 38-2269(b)(5), my colleagues' holding that Father is a fit parent to properly care for a five-

year-old child now and for the next four years is without legal precedent in Kansas. To the contrary, there is Kansas precedent that parental termination under K.S.A. 2020 Supp. 38-2269(b)(5) is appropriate when a parent of a young child is incarcerated for a lengthy period of time. Moreover, the majority's emphasis on the importance of Father having completed some parenting tasks while incarcerated is not controlling under K.S.A. 2020 Supp. 38-2269(b)(5).

Finally, assuming that pre-incarceration evidence of parental fitness is probative in this case, there was considerable competent evidence to show that prior to his incarceration, Father was an unfit parent due to his numerous drug dealings, engaging in criminal behavior that imperiled his parental rights to T.H., and failing to provide T.H. with a safe, secure, and healthy home by repeatedly returning his son to Mother's care with knowledge of her neglectful and injurious parenting.

FAILURE OF REASONABLE EFFORTS BY APPROPRIATE PUBLIC OR PRIVATE AGENCIES TO REHABILITATE THE FAMILY (K.S.A. 2020 SUPP. 38-2269[b][7])

A second statutory factor that the district court found established Father's parental unfitness was the failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family. K.S.A. 2020 Supp. 38-2269(b)(7). In making its ruling, the district court stated that "there is a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family, and [it] will be impossible for them to rehabilitate [T.H.] into the [F]ather's home for the next roughly four years." In short, due to Father's lengthy incarceration, the customary case plan goals for reintegrating T.H. in Father's home and obtaining permanency could not be achieved.

The majority, however, has a different understanding of how this statutory factor applies to Father's parental unfitness. The majority states: "The parties agree that Father was compliant with the permanency plan; therefore, there was insufficient evidence to

54

support a finding that the reasonable efforts of the enforcement agencies failed." Slip op. at 21. This is a significant misreading of K.S.A. 2020 Supp. 38-2269(b)(7), the district court's finding as to this statutory factor, and the record.

At the termination hearing, Eiland discussed the case plan tasks that SFCS developed for Father upon his incarceration in March 2020. Two tasks that Father accomplished were attending a parenting class in prison and filing an Indian Child Welfare Act affidavit. Father was also required to abstain from drug and alcohol use, but SFCS was unable to arrange for drug testing by the Kansas Department of Corrections. Under these circumstances, this task could not be completed.

Another important task for Father was to participate in case management and family preservation services. But family preservation services are designed for rehabilitating the parent and child in the parent's home and these services obviously do not apply in the prison setting. This was confirmed by Eiland when she testified: "There [are] not many services we can provide [Father] while he's incarcerated." Similarly, and as readily conceded by Father's counsel at the hearing, tasks requiring Father to obtain background checks for individuals having contact with T.H. and ensuring that persons supervising T.H. are not under the influence of drugs or alcohol do not apply to Father because as Eiland testified, "[Father is] not able to do that since he is in prison."

In making her closing argument on Father's behalf, Father's attorney said it best: "[Father's] case plan was *extremely limited*, but it is what it is." (Emphasis added.) Given Father's lengthy incarceration, DCF and SFCS were unable to reintegrate T.H. into Father's home now and in the foreseeable future. That is because many of the services ordinarily offered by DCF and SFCS could not be provided to Father while he was in prison or were inapplicable given his lengthy incarceration.

55

Viewing all the evidence in a light most favorable to the State, there was clear and convincing evidence that given Father's lengthy incarceration, there was a failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family. See K.S.A. 2020 Supp. 38-2269(b)(7). As a consequence, contrary to the majority's holding, the district court did not commit reversible error by basing its parental unfitness finding, in part, on this second statutory factor of unfitness, K.S.A. 2020 Supp. 38-2269(b)(7).

## THE BEST INTERESTS OF T.H.

In its order terminating Father's parental rights, the district court ruled: "Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child [T.H.] and the physical, mental or emotional needs of the child would best be served by termination of parental rights."

Our Supreme Court has established an appellate court's standard of review in considering whether a district court has abused its discretion in determining the best interests of the child:

> "When an appellate court reviews a district court's best interests of a child determination, it recognizes that *the district court is in the best position to make the inquiry* and, in the absence of abuse of sound judicial discretion, its judgment will not be disturbed on appeal. Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, *if no reasonable person would have taken the view adopted by the district court*; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." (Emphases added.) *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, Syl. ¶ 4, 392 P.3d 68 (2017).

Of note, it is Father's burden to show that the district court abused its discretion. See *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

Since my colleagues and Father do not claim that the district court's abuse of discretion was based on an error of law or fact, the issue presented is whether no reasonable person would have taken the view adopted by the district court that it was in T.H.'s best interests to terminate Father's parental rights.

My colleagues reprise their prior argument: "Finding that the best interests of T.H. would not be met based solely on an internal policy preference without giving consideration to the unique facts of the case is not reasonable." Slip op. at 28. As I discussed earlier as part of the parental unfitness analysis, Kansas statutes and caselaw mandate a child's reintegration or permanency within a reasonable period of time. I reassert my prior arguments, statutory references, and caselaw emphasizing the importance of T.H. having a permanent and stable home within a reasonable period of time—giving special consideration to the concept of child time. These factors are also important considerations in the analysis of the best interests of the child.

In this case, two knowledgeable persons—Eiland, and Kyle C. Allen, the guardian ad litem representing T.H.—both supported termination in the best interests of T.H. Eiland is a permanency specialist employed by SFCS, a private agency that contracts with DCF to provide, among other services, assistance to Kansas district courts in evaluating whether a parent is unfit now and in the foreseeable future and whether it is in the best interests of the child to have their parent's rights terminated. Eiland received her bachelor's degree in Family Studies and Human Services from Kansas State University. As a permanency specialist, she also receives ongoing training regarding "helping children receive permanency" and "the importance [of keeping] children with family."

As mentioned earlier, Eiland opined that termination of Father's parental rights was in the best interests of T.H. She stressed that given T.H.'s young age and Father's lengthy incarceration, it was important for the child to have permanency in his life.

57

Eiland testified that "working reintegration with [Father] for another three-and-a-half, four years, I don't believe, is in [T.H.'s] best interest. He needs the permanency." Eiland also testified that, in fact, the reintegration process would last more than four years because after Father's release from prison, T.H. could not be reintegrated into Father's home until numerous case plan tasks had been completed.

Since Father's incarceration in March 2020, T.H. has been residing with his four sisters and maternal grandparents. Eiland opined that separating T.H. from his four sisters would not be in his best interests. Importantly, one of the points of severance Eiland prepared for the district court was that T.H.'s sisters mentioned that it was a "trauma" for them when their brother was separated from the family. Eiland's opinion emphasizing the importance of T.H. not being separated from his sisters was corroborated by Grandfather's testimony. He testified that T.H. enjoyed playing outside and spending time with his sisters. When asked if T.H. had a bond with his sisters, Grandfather testified, "Oh, yeah. Sometimes not good, but they bond."

I agree with my colleagues that T.H. "is currently in the loving care of his maternal grandparents" and that he "is allowed to maintain the familial bond with his siblings." Slip op. at 27. Grandfather and Grandmother have provided the primary support for T.H., including housing, food, and other necessities for T.H. and his siblings. T.H. has returned to preschool and, according to Grandfather, "He's doing a lot better." Grandfather also indicated that T.H. understood that Father was in prison, but that he was too young to fully understand the situation. In short, T.H. is thriving, while living with his sisters, in the care of his Grandparents.

At the termination hearing, T.H. was represented by guardian ad litem Allen. In addition to Eiland, the district court had the benefit of Allen's questioning and arguments at the termination hearing. Allen informed the district court that, in her opinion, the State

had met its burden and Father was unfit. She argued that T.H. deserved a permanent home and that termination was in her client's best interests.

Allen's greatest concern was Father's repeated drug dealing. Allen posed this rhetorical question: "[I]f [Father] wouldn't have gotten caught in 2019, would he still be dealing meth?" Allen concluded, "I have a hard time looking past that." Given Father's continuing drug distribution activity in 2019 after his initial felony conviction in 2016, Allen's question and concerns are quite sensible. It is not in the best interests of T.H. to be separated from Father for four or more years with no assurance that Father would not return to a life of dealing drugs. Moreover, if Father violated any conditions of his 36-month postrelease supervision term upon his release from prison, Father would once again face the prospect of additional incarceration, and T.H.—at 9, 10, or 11 years of age—would, once again, face the uncertain prospect of a life without a fit parent while still waiting for a permanent and stable home.

Our Supreme Court has instructed that as an appellate court we should recognize that "the district court is in the best position to make the inquiry" about the best interests of the child. *Smith*, 306 Kan. 40, Syl. ¶ 4. In this case, our court does not have the benefit that was afforded to the district court to evaluate first-hand the testimony of Eiland, Grandfather, Stephanie, and Father. Only the district court heard their testimony, evaluated their credibility, determined which one was telling the truth or lying, noted which one had a better memory, or concluded that one or more witness' testimony was more coherent and convincing. That was the purview of the district court and, as an appellate court, we should respect the limitations inherent in our review for abuse of discretion.

Father has wholly failed to meet his burden to prove that "no reasonable person would have taken the view adopted by the district court." 306 Kan. 40, Syl. ¶ 4. The district court's legal conclusion that termination of parental rights was in T.H.'s best

interests was in accordance with Kansas statutes and caselaw, and an appropriate exercise of judicial discretion.

CONCLUSION

In conclusion, our court's standard of review compels affirmance of the district court's termination of Father's parental rights. As the majority properly acknowledges:

> "When we review a finding of parental unfitness, this court must determine, after *reviewing all the evidence in a light most favorable to the State*, whether a rational fact-finder could have found the ultimate determination to be highly probable, i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, *the appellate court does not weigh conflicting evidence*, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705." (Emphasis added.) Slip op. at 14.

A fair reading of the majority opinion yields the conclusion that my colleagues have not reviewed the evidence in a light most favorable to the State but have presented their arguments and marshalled their evidence in a light most favorable to Father. Moreover, my colleagues have not only repeatedly weighed conflicting evidence, but their assessment of that evidence, once again, has been made with a view most favorable to Father's legal position. This incorrect application of our standard of appellate review is error.

At the conclusion of the termination hearing, the county attorney addressed the district court. Paraphrasing our court in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008), the county attorney argued:

> "I think that cases like, you know, like these are difficult. A parent under the law may be labeled unfit even though they love the child. In fact, . . . almost always, you have

60

a parent who comes and who does love their child and wants what's best for their child, wants to do the right thing, and I do believe [Father] loves his son and I do believe that to some degree he does want to do the right thing. But we have to judge the cases based upon actions and not intentions, so we have to keep in mind that a child deserves this resolution in a timeframe that makes sense to him at his young age. He's five years old. He needs a timeframe that's appropriate in his sense of time.

"So you go almost twice his life span, he's going to be eight-and-a-half, and now [Father is] saying that's not very long or that's not too long, and I think it's definitely, definitely too long, and it's certainly not in his best interest."

The district court then prefaced its termination ruling by acknowledging, "I know that this is hard for me and it's hard for a lot of people involved." While difficult, in my estimation, the district court got it right. The district court's order terminating Father's parental rights was in faithful adherence to our state's public policy which is to "[c]onsider the safety and welfare of a child to be paramount in all proceedings under the code." K.S.A. 2020 Supp. 38-2201(b)(1). T.H. deserves the full measure of protection afforded him under Kansas law.

I would affirm the district court's termination of Father's parental rights.